# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

DONALD PARKELL, et al.,                )
                                       )
             Plaintiffs,               )
                                       )
      v.                               )        Civ. No. 17-157-LPS
                                       )
WARDEN DAVID PIERCE, et al.,           )
                                       )
             Defendants.               )

## PLAINTIFF'S ANSWERING BRIEF
## IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

DATED:  February 6, 2018

JAMES S. GREEN, SR. (DE0481)
JARED T. GREEN (DE5179)
SEITZ, VAN OGTROP & GREEN, P.A.
222 Delaware Avenue, Suite 1500
P. O. Box 68
Wilmington, DE  19899
(302) 888-0600
*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

TABLE OF CITATIONS ................................................................................................................. ii

NATURE AND STAGE OF PROCEEDINGS .......................................................................... 1

SUMMARY OF ARGUMENT .................................................................................................... 2

INTRODUCTION .......................................................................................................................... 2

STATEMENT OF FACTS ............................................................................................................ 3

ARGUMENT .................................................................................................................................... 8

    I.     STANDARD OF REVIEW ................................................................................. 8

    II.    FORMER GOVERNOR MARKELL IS NOT PROTECTED BY LEGISLATIVE IMMUNITY ................................................................................................................. 12

    III.   PLAINTIFF SUFFICIENTLY ALLEGES PLAUSIBLE PERSONAL INVOLVEMENT BY THE DEFENDANTS. ...................................................... 13

    IV.   THE COMPLAINT STATES BOTH A PLAUSIBLE POLICY OR PRACTICE CLAIM AND A DIRECT LIABILITY CLAIM. .............................................. 16

          A.    Use of Force ............................................................................................. 17

          B.    Denial of Medical Care ......................................................................... 18

          C.    Failure to Protect ................................................................................... 18

          D.    Due Process Claims ............................................................................... 18

    V.    DEFENDANTS DO NOT HAVE QUALIFIED IMMUNITY ........................... 19

CONCLUSION ............................................................................................................................... 20

## TABLE OF CITATIONS

### Cases

Amy v. Supervisors,
78 U.S. 136 (1870)................................................................................................. 13

Ashcroft v. Iqbal,
556 U.S. 662 (2009)................................................................................. 9, 10, 11, 13

Baraka v. McGreevey,
481 F.3d 187 (3d Cir. 2007)................................................................................... 12

Bell Atlantic Corp. v. Twombly,
550 U.S. 544 (2007)....................................................................................... 9, 10, 11

Bistrian v. Levi,
696 F.3d 352 (3d Cir. 2012)..................................................................................... 8

Bogan v. Scott-Harris,
523 U.S. 44 (1998)........................................................................................... 12, 13

City of Pittsburgh v. West Penn Power Co.,
147 F.3d 256 (3d Cir. 1998)..................................................................................... 3

Connelly v. Lane Constr. Corp.,
809 F.3d 780 (3d Cir. 2016)............................................................... 9, 10, 11, 13, 14

Davis v. Kelly,
160 F.3d 917 (2d Cir. 1996)..................................................................................... 4

Estate of Lagano v. Bergen Cty. Prosecutor's Office,
769 F.3d 850 (3d Cir. 2014)................................................................................... 12

Estelle v. Gamble,
429 U.S. 97 (1976)................................................................................................. 18

Farmer v. Brennan,
511 U.S. 825 (1994)................................................................................... 17, 18, 20

Fowler v. UPMC Shadyside,
578 F.3d 203 (3d Cir. 2009)..................................................................................... 9

Great Western Mining & Mineral Co. v. Fox Rothschild LLP,
615 F.3d 159 (3d Cir. 2010)............................................................................... 9, 10

ii

Handberry v. Thompson,
446 F3d 335 (2d Cir. 2006)........................................................................................... 19

Harlow v. Fitzgerald,
457 U.S. 800 (1982).................................................................................................... 19

Hastings v. Ray,
2007 WL4662114 (Del. Super. Ct. Sept. 27, 2007)........................................................ 4

Hudson v. McMillan,
503 U.S. 1 (1992)....................................................................................................... 17

Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,
507 U.S. 163 (1993).................................................................................................... 20

Mitchell v. Horn,
318 F.3d 523 (3d Cir. 2003).......................................................................................... 19

Morrison v. Olson,
487 U.S. 654 (1988).................................................................................................... 13

Opinion of the Justices,
380 A.2d 109 (Del. 1977)............................................................................................. 12

Parkell v. Frederick,
C.A. No. 15-718 LPS (D.Del.)) ...................................................................................... 6

Phillips v. County of Allegheny,
515 F.3d 224 (3d Cir. 2008)................................................................................. 9, 10, 11

Sandin v. Conner,
515 U.S. 472 (1995).................................................................................................... 19

Schmidt v. Skolas,
770 F.3d 241 (3d Cir. 2014)............................................................................................ 3

Schuchardt v. President of the U.S.,
839 F.3d 336 (3d Cir. 2016)................................................................................. 9, 10, 11

Swierkiewicz v. Sorema, N.A.,
534 U.S. 506 (2002).................................................................................................... 11

U.S. ex rel. Customs Fraud Investigations, LLC. v. Victaulic Co.,
839 F.3d 242 (3d Cir. 2016)........................................................................................... 10

## **Statutes and Other Authorities**

28 U.S.C. §1915 .................................................................................................................... 1

42 U.S.C. §1983 .............................................................................................................. 1, 16

Del.Const., Art. III, § 1 ...................................................................................................... 12

Fed. R. Civ. P. 12(b)(6) ............................................................................................. 1, 12, 18

U.S. Const. amend. VIII .................................................................................................. 17, 20

U.S. Const. amend. V ....................................................................................................... 20

U.S. Const. amend. XIV ................................................................................................... 20

## NATURE AND STAGE OF PROCEEDINGS

On February 14, 2017, Plaintiff Donald D. Parkell ("Plaintiff" or "Parkell"[1]) filed a hand-written pro se Complaint under 42 U.S.C. §1983 on his own behalf and similarly situated inmates at the James T. Vaughn Correctional Center ("JTVCC") seeking damages and injunctive relief for constitutional deprivations before and following a violent takeover of JTVCC Building C on February 1 and 2, 2017. (DI 1)

On February 24, Parkell filed an Amended Complaint (DI 5). On February 28, 2017, he filed a Declaration in Support of the Amended Complaint (DI 6) and on March 2, 2017, he filed an Amendment to the Amended Complaint (DI 9).

On April 27, 2017, the Court ruled that Plaintiff had identified what appear to be cognizable and non-frivolous 42 U.S.C. §1983 and supplemental state claims within the meaning of 28 U.S.C. §1915A(b) and §1915(e)(2)(B), and directed the Clerk of Court to attempt to refer representation of Plaintiff a member of the Federal Civil Panel. (DI 30) On May 24, 2017, the Court recognized the representation of the undersigned attorneys as counsel for Plaintiff. (DI 31)

On October 5, 2017, pursuant to a Stipulation and Order, Plaintiff filed a Second Amended Complaint consolidating the previous pro se pleadings and adding several additional defendants. (DI 34) On November 9, 2017, the Defendants filed a Motion to Dismiss all claims pursuant to Fed. R. Civ. P. 12(b)(6). (DI 36) On December 6, 2017, Plaintiff filed a Third Amended Complaint. (DI 41) On December 29, 2017, Defendants filed a Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) (DI 42) and their Opening Brief in Support thereof. (DI 43) This is Plaintiff's Answering Brief in Opposition to Defendants' Motion to Dismiss.

---

[1] Although Plaintiff has filed this case as a class action, for simplicity sake, we will refer simply to "Plaintiff" throughout.

1

## SUMMARY OF ARGUMENT

I.      Plaintiff's Complaint contains sufficient factual matter to state a claim that is plausible on its face.

II.     Governor Markell is not protected by legislative immunity.

III.    The Complaint alleges plausible personal involvement by Defendants.

IV.     The Complaint states both a plausible policy or practice claim and a direct liability claim.

V.      Defendants do not have qualified immunity.

## INTRODUCTION

Defendants open their Brief ("DOB__") with the following passage: "Delawareans are aware of the brutal takeover at the James T. Vaughn Correctional Center ("JTVCC") earlier this year, during which inmates from C Building held several correctional officers hostage, assaulted the abducted officers, and murdered Lieutenant Steven R. Floyd. Following the riot, the Department of Correction ("DOC") and the State began the unenviable task of determining who among the 120 C Building inmates caused the riot, committed the assaults and murdered Lt. Floyd. The State not only had to bring those individuals to justice, but also had the obligation to protect officers, staff, and other inmates from the perpetrators after the riot." (DOB1) (Emphasis added.)

The State had the obligation to protect officers, staff, and other inmates from the perpetrators long before the riot. It had the obligation to ensure the safety of the officers, staff, counsellors, and other inmates from the day JTVCC opened its doors, but has tragically failed to do so. The Plaintiff in this case and the class he represents are victims of the State's abject failure to make JTVCC safe for anyone behind its walls. To compound its dereliction of duty, rather than protect Plaintiff and the class of inmate victims following their re-taking of Building C, the Defendants punished them by beatings, torture, destruction of their property, deprivation of

2

medical, psychiatric, and dental care, and placing them in solitary confinement with no opportunity to be heard. That is what this case is about.

To make matters worse, it appears that the Defendants' conduct may well have gone beyond deliberate indifference. On January 20, 2017 – less than two (2) weeks before his murder, Lt. Floyd requested that certain inmates be removed from Building C. His pleas were ignored by his superiors. Only discovery will reveal the facts behind this tragic failure and who is responsible. Worse, there is evidence that some of the Defendants intentionally created the unreasonably dangerous situation in Building C to undermine the Court Order in the  CLASI Case (Community Legal Aid Society, Inc. v. Coupe, C.A. No. 15-688 (GMS)).

## STATEMENT OF FACTS[2]

Parkell is a prisoner in the custody of the DOC. On February 1 and 2, 2017, Parkell was housed at JTVCC Building C. (TAC ¶13) Defendant David Pierce ("Pierce") was the Warden of JTVCC from August 25, 2013 to February 21, 2017. (TAC ¶14) Defendant Phillip Parker ("Parker") was a Deputy Warden of JTVCC on and prior to February 1 and 2, 2017. On or about February 21, 2017, Parker was named Acting Warden of JTVCC. (TAC ¶15) Defendant Dana Metzger ("Metzger") was appointed Warden of JTVCC on May 19, 2017. (TAC ¶16) Defendant Perry Phelps ("Phelps") is the Commissioner of DOC. (TAC ¶17) Defendant Jack Markell ("Markell) was Governor of the State of Delaware from January 2009 until January of 2017. (TAC ¶18) Defendant Robert Coupe ("Coupe") was the DOC Commissioner from 2013 until January 2017. (TAC ¶19) Defendants John and Jane Does are DOC corrections officers whose

---

[2] Defendants note that, "[t]here have been multiple reports issued in connection with the uprising, and eighteen inmates have been indicted on First Degree Murder and other charges."  (DOB3 n.2)  These reports which are included in Plaintiff's Appendix hereto, are part of the public record, and can be considered by the Court in deciding Defendants' Motion.  See e.g., Schmidt v. Skolas, 770 F.3d 241, 249 (3d Cir. 2014); City of Pittsburgh v. West Penn Power Co., 147 F.3d 256, 259 (3d Cir. 1998).  Plaintiff is filing with this Brief an Appendix containing some of the public record supporting his allegations.  References to the Appendix are cited "A__."

identities are not yet known. (TAC ¶20)[3] Plaintiff identifies DOC as a State Agency whose mission is to protect the public by supervising adult offenders through safe and humane services, programs, and facilities. (TAC ¶21) DOC is not named as a party.

On February 1, 2017, Parkell was classified as a medium security inmate and was assigned to Building C, a medium security unit. (TAC ¶22) On the morning of February 1, a number of inmates in Building C coordinated an attack on three of the Building corrections officers, murdering one and beating the other two. (TAC ¶¶24, 25, 27-29) The attackers also took a counsellor, Ms. May, hostage. (TAC ¶26)

The attackers lit fires in the Building, barricaded exit points and forced Ms. May into a cell. (TAC ¶¶30-32) Parkell and two other inmates, Carello and Downing, protected Ms. May from the attackers. (TAC ¶¶33-36, 40-41, 43) The attackers threatened Parkell, Carello, and Downing. (TAC ¶36) The fires that the attackers set triggered a fire alarm and sprinklers filling the building with alarm sounds and water. (TAC ¶¶37-38) During the takeover, the hostage inmates packed their personal property in boxes and bags safely and securely on top of their beds. (TAC ¶¶44, 47)

At approximately 5:00 a.m. on February 2, the Building was stormed by authorities. (TAC ¶50) Parkell, Carello, and Downing called out to the rescue unit and Ms. May was taken to safety. (TAC ¶51) Ms. May asked the rescue unit not to hurt Parkell, Carello, and Downing who kept her safe and were hostages themselves, and a sergeant instructed other officers not to hurt these three. (TAC ¶¶52-54) Following orders from Pierce, Parker, and Phelps, other inmate

---

[3] Defendants cite a Delaware State Court case, Hastings v. Ray, 2007 WL4662114 at *5 (Del. Super. Ct. Sept. 27, 2007) for the proposition that naming John Doe defendants has no legal effect. (DOB 3, n.1)  That is because there is no statute in Delaware permitting it.  However, the use of John Doe as a pseudonym for unknown defendants until their identities can be ascertained has long been recognized in Federal Courts.  See e.g., Davis v. Kelly, 160 F.3d 917, 921 (2d Cir. 1996) and cases cited therein.

hostages were restrained and beaten by the rescue team and many were seriously injured. (TAC ¶¶55-56, 80) (A192-202)

Following the re-take of Building C, all inmates were moved to Security Housing Units ("SHU") and placed in solitary confinement. (TAC ¶¶57-59) Diets were restricted; inmates' personal property was destroyed; medical and psychiatric treatment was denied. (TAC ¶¶60-61, 64-69) Even though 18 inmates were indicted on October 16, 2017 and transferred out of JTVCC, Parkell, who has a medium security was held in SHU until January 19, 2018 when he was moved out of state. Following the re-take, Parker and Phelps formed teams of officers to terrorize and torture inmates in retaliation for the uprising. (TAC ¶78) (A190-202, 297-302)

Beginning at least as early as 2001, JTVCC has been intentionally understaffed. (TAC ¶¶83-84). This understaffing led to chronic fatigue and extreme stress for the JTVCC officers. (TAC ¶90) As early as 2003 and 2004, the Corrections Officers Association of Delaware ("COAD") and an outside security expert warned of the critically dangerous situation at JTVCC and the deadly consequences that could be expected. (TAC ¶¶91-95) The predictions were realized in July 2004, when a JTVCC counsellor was abducted and repeatedly and violently raped by an inmate. (TAC ¶96) Following the rape, a task force was commissioned to study the situation at JTVCC and make recommendations to address problems. The Task Force report ("2005 Report") identified key problems as severe understaffing, excessive overtime, complacency, inadequate training and supervision, and the officers were found to be working in great confusion. (TAC ¶98) (A128)

Despite the 2005 Report, Defendant Markell enacted a policy which relied even more on overtime rather than filling the critical understaffing of officers, and the DOC overtime budget doubled during Markell's administration. (TAC ¶¶101-102) Defendant Coupe implemented

Markell's overtime policy, and by 2017 more than 40% of JTVCC's staffing was filled by overtime. (TAC ¶103-104) Coupe admitted that security at JTVCC was threatened by understaffing. (TAC ¶105) Nevertheless, Markell ordered that at least 90 DOC positions must go unfilled at all times despite safety requirements. (TAC ¶¶106-107) Defendants were warned about these safety risks and potential deaths at JTVCC by COAD and officer reports, but ignored these warnings. (TAC ¶¶108-110) Plaintiff alerted the State about safety issues created by a lack of security cameras in a lawsuit he filed in 2015 (Parkell v. Frederick, C.A. No. 15-718 LPS (D.Del.)) and repeatedly offered to provide his assistance in improving conditions, but his assistance was spurned. (TAC ¶¶111-114)

Not only did the Defendants ignore the warnings of COAD and the 2005 Report, on January 20, 2017, Lt. Floyd warned Defendants about the serious situation in Building C and requested that certain inmates be removed. Consistent with their past deliberate indifference, Defendants ignored this request, and the consequences were deadly.[4]

The public record corroborates many of the other allegations of the Complaint. The 2005 task force which included Chancellor Grover Brown and Judge Vincent Bifferato, concluded that there was excessive reliance on overtime, which reduces morale, increases turnover, and leads to numerous security breakdowns as tired staff fall victim to complacence. (2005 Report at X (A12)) It also found that there were blind spots beyond camera view and there was a need for additional cameras to enhance security. (Id. at 33 (A58)) The taskforce specifically recommended that the "Governor and members of the General Assembly are made fully aware of staffing shortages on a regular basis, so that they may act accordingly, before the situation reaches crisis." Id. at 63 (A88), and that "the State must reduce the excessive amount of overtime

---

[4] Final Report Independent Review of Security Issues at the James T. Vaughn Correctional Center dated August 2017, p.4.  ("2017 Report, A203-361")

that is currently being drawn upon to compensate for the shortage of security personnel." (Id. at 64 (A89)) Further, the security camera profile should be assessed and attempt to address the blind spot areas in the prison buildings. (Id. at 66 (A91)) Markell ignored the taskforce recommendations and by the end of his governorship, 40% of JTVCC's staffing was filled by overtime shifts. (TAC ¶104)

Excessive overtime, fatigued and disgruntled JTVCC staff, animosity between JTVCC staff, and between staff and inmates, inmate allegations of inappropriate conduct by some correctional staff, inconsistent discipline, and structural characteristics also contributed to cultivating an environment vulnerable to violence in the C Building and the JTVCC." (2017 Report at 15 (A217)) Following an incident on January 15, 2017 in which certain C Building inmates refused to return to their cells after recreation until they spoke with a supervisor regarding the conditions in C Building, correctional officers, including Lt. Floyd, identified certain inmates and advised their supervisors that they should be removed from C Building for security purposes. Based upon an email written by Defendant Pierce, the identified inmates were not removed from C Building. (Id. 15-16 (A217-218)) The Final Report also concluded that a November 16, 2016 memo from Pierce to all correctional staff was a passive aggressive attempt to force the implementation of the CLASI Order to fail. (Id. at 24 n. 78 (A226)) The report found that serious leadership problems existed at all levels of the JTVCC; and that there was a significant disconnect between JTVCC administrators and line-level staff impacting daily operations. (Id. at 23-25 (A225-227)) JTVCC is critically understaffed. (Id. at 29 (A231)) Officer training at JTVCC is inadequate, especially interpersonal communications skills. (Id. at 46-48 (A248-250)) The JTVCC staff did not conduct any debriefs or after-action reports following the January 15, 2015 [sic] (2017) uprising, so there was no opportunity to learn and make changes to

safety and security prior to the February 1, 2017 incident. (Id. at 55 (A257)) The lack of cameras in C Building indirectly contributed to the February 1, 2017 incident. (Id. at 61 (A263)) Required inmate medical and mental health needs are not being delivered at JTVCC. (Id. at 65(A267)) JTVCC does not provide adequate inmate programs and, in fact, did not support programs for inmates, nor does JTVCC incentivize positive behavior. (Id. at 67-70 (A269-272)) Incredibly, the previous administration – headed by Pierce – did not support inmate programs and steadily eliminated them at JTVCC. (Id.) Many of the allegations of the Complaint are corroborated by contemporaneous letters from inmates and the ACLU. (A192-202; A297-302)

Plaintiff was an innocent hostage of the perpetrators of the February 1, 2017 takeover of Building C which was a direct and foreseeable – indeed predicted – result of the Defendants' deliberate actions and/or deliberate indifference to the known security risks of JTVCC and certain inmates, including the perpetrators of the takeover. As a result, Plaintiff was physically injured protecting Ms. May and suffered severe mental and emotional distress as a result of the incident. Although classified as a medium security prisoner, and known by Defendants not to have been a perpetrator of the takeover and criminal acts, he has been placed in maximum security since February 2, 2017, deprived of much needed medical, mental, and dental treatment, his food rations have been reduced, and his personal property seized and not returned. (TAC ¶119) His physical and mental health has deteriorated because of his isolated confinement (Id. at 120), but he still he has not been provided treatment.

## ARGUMENT

## I.   STANDARD OF REVIEW

"The touchstone of the pleading standard is plausibility." Bistrian v. Levi, 696 F.3d 352, 365 (3d Cir. 2012). "To survive a motion to dismiss, a complaint must contain sufficient factual

matter, accepted as true, to state a claim to relief that is plausible on its face." <u>Connelly v. Lane Constr. Corp.,</u> 809 F.3d 780, 786 (3d Cir. 2016).

As the Third Circuit recently explained, "the plausibility standard does not impose a heightened pleading requirement, … continues to require only a 'showing' that the pleader is entitled to relief." <u>Schuchardt v. President of the U.S.,</u> 839 F.3d 336, 347 (3d Cir. 2016). <u>Accord Phillips v. County of Allegheny,</u> 515 F.3d 224, 233 (3d Cir. 2008) (the Supreme Court in <u>Twombly</u> "emphasized throughout its opinion that it was neither demanding a heightened pleading standard of specifics nor imposing a probability requirement.") It need not be "rich with detail." <u>Fowler v. UPMC Shadyside,</u> 578 F.3d 203, 211-12 (3d Cir. 2009). The "plausibility standard does not impose a probability requirement, [but] it does require a pleading to show more than a sheer possibility that a defendant acted unlawfully." <u>Connelly,</u> 809 F.3d at 786. The complaint's "factual allegations must be enough to raise a right to relief above the speculative level." <u>Great Western Mining & Mineral Co. v. Fox Rothschild LLP,</u> 615 F.3d 159, 176 (3d Cir. 2010) (quoting <u>Bell Atlantic Corp. v. Twombly,</u> 550 U.S. 544, 522 (2007)). As the Statement of Facts, the entire Complaint, and the public record makes clear, Plaintiff far exceeds this minimal pleading standard.

"Even after <u>Twombly</u> and <u>Ashcroft v. Iqbal,</u> 556 U.S. 662 (2009), a complaint's allegations of historical fact continue to enjoy a highly favorable standard of review at the motion-to-dismiss stage of proceedings." <u>Connelly,</u> 809 F.3d at 790. The Court "must still ... assume all remaining factual allegations to be true, construe those truths in the light most favorable to the plaintiff, and then draw all reasonable inferences from them." <u>Id.</u> Thus, the facts summarized above - historically detailing who did what, when, where and why - cannot be

ignored as the defense seeks, but instead as history must be taken in the light most favorable to plaintiff, who receives all the inferences from them.

The Third Circuit recently explained that the existence of a "detailed insider account," although not necessary for a complaint, "strongly supported the plausibility of "a plaintiff's allegations." Schuchardt, 839 F.3d at 348.

As set forth in the Facts above, the Complaint specifically discusses two such "detailed insider accounts," the critical 2004 Outside Expert Report from the DOC's own expert and the 2005 Executive Task Force Report from Chancellor Brown and Judge Bifferato. The 2017 Report of security issues at JTVCC by former U.S. Attorney Oberly and Judge Chapman further supports the Complaint. All of these official government reports are qualitatively similar to, yet a step above, the 'detailed insider accounts' the Third Circuit has found so convincing and supportive of plausibility. Each is consistent with the allegations of the Complaint and supports the plausibility of the allegations.

The Court "must refrain from engaging in any credibility determinations." U.S. ex rel. Customs Fraud Investigations, LLC. v. Victaulic Co., 839 F.3d 242, 256 (3d Cir. 2016). As the Supreme Court explicitly held in Iqbal, factual allegations that are "unrealistic," "nonsensical," "chimerical," and even "extravagantly fanciful" must still be taken as true. Iqbal, 556 U.S. at 681; accord Connelly, 809 F.3d at 789; Great Western, 615 F.3d at 177. This is so "even if it strikes a savvy judge that actual proof of those facts is improbable and that a recovery is very remote and unlikely." Twombly, 550 U.S. at 556; see Great Western, 615 F.3d at 176 ("improbable"); Phillips, 515 F.3d at 231 (even if it is "unlikely that the plaintiff can prove those facts or will ultimately prevail"). Defendants clearly do not like the detailed factual allegations set forth in the Complaint, because of the horrific, yet truthful, light it paints them in. But because the

10

allegations are factual in nature, they cannot be ignored even if they were incorrectly characterized as "unrealistic," "nonsensical," "chimerical," or "extravagantly fanciful." Iqbal, 556 U.S. at 681. The Supreme Court has clearly spoken on this point.

Courts also "cannot inject evidentiary issues into the plausibility determination." Schuchardt, 839 F.3d at 347. As the Third Circuit has explained in a post-Twombly substantive due process case, "[s]tandards of pleading are not the same as standards of proof." Phillips, 515 F.3d at 246. As recently explained, "[i]t is worth reiterating that, at least for purposes of pleading sufficiency, a complaint need not establish a prima facie case in order to survive a motion to dismiss." Connelly, 809 F.3d at 788. A prima facie case "is an evidentiary standard, not a pleading requirement and hence is not a proper measure of whether a complaint fails to state a claim." Id. at 789 (citing Swierkiewicz v. Sorema, N.A., 534 U.S. 506, 510 (2002)). "Instead of requiring a prima facie case, the post-Twombly pleading standard simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary elements." Id. "Pleadings must be construed so as to do justice." Fed.R.Civ.P. 8(e). This has long been the law in our local federal courts,[5] continues to be the law today, post-Iqbal,[6] and is further reason to deny the defense motion.

To the extent the Court ultimately disagrees with plaintiffs' position that the defense motion is completely without merit, plaintiffs will assert their right to amend the Complaint prior

---

[5] See Herman v. Mut. Life Ins. Co. of N.Y., 108 F.2d 678, 679 (3d Cir. 1939) (a complaint must be construed "as to do substantial justice"); Guilday v. Dep't of Justice, 451 F.Supp. 717, 722 (D.Del. 1978) ("A complaint is to be liberally construed in favor of the plaintiff.").
[6] See, e.g. Hall v. DIRECTV, LLC, 846 F.3d 757, 765 (4th Cir. 2017) ("a complaint is to be construed liberally so as to do substantial justice"); Bret Binder v. Weststar Mortg., Inc., 2016 WL 3762710, *3 (E.D.Pa. July 13, 2016) ("Under Rule 8, Fed.R.Civ.P., pleadings are to be liberally construed...."); Mangan v. Corp. Synergies Grp., Inc., 834 F.Supp.2d 199, 204 (D.N.J. 2011) ("liberally construed").

to dismissal. See Estate of Lagano v. Bergen Cty. Prosecutor's Office, 769 F.3d 850, 861 (3d Cir. 2014) ("a district court considering a 12(b)(6) dismissal must permit a curative amendment unless such an amendment would be inequitable or futile.")

## II.   FORMER GOVERNOR MARKELL IS NOT PROTECTED BY LEGISLATIVE IMMUNITY.

Defendants cite the established body of law that under certain circumstances, state level executive branch officials may sometimes be entitled to legislative immunity. See Bogan v. Scott-Harris, 523 U.S. 44 (1998); Baraka v. McGreevey, 481 F.3d 187 (3d Cir. 2007). Yet this defense is doomed by the actual facts as pled, as well as the existence of the State's Agreement with COAD (A130-174) which obligated the State to ensure a safe and secure work environment for corrections officers, and the CLASI Order (A175-191).

The Complaint only challenges security policies enacted by Governor Markell within his sphere of law enforcement responsibility in the executive branch. (See, e.g. TAC¶¶100-107, Markell's policy of not filling vacant positions) The Complaint does not challenge legislative action. It alleges that "Markell ordered that at least 90 vacant DOC positions must go unfilled at all times;" and that "Markell ordered that his vacant positions policy must be obeyed even when critical staffing and safety requirements necessitated they be filled." (TAC ¶¶106-107) (Emphasis added.)

The Delaware Supreme Court has specifically held that the provision of security is an "inherently executive" function, not a legislative one and that any attempt by the legislature to assume such a function violates the separation of powers doctrine. Opinion of the Justices, 380 A.2d 109, 113 (Del. 1977) (citing Del.Const., Art. III, § 1); id. at 116 ("inherently executive in nature").

In the same way, the Department of Correction is a branch of law enforcement which is executive in nature. <u>See, e.g.</u> <u>Morrison v. Olson,</u> 487 U.S. 654, 691 (1988) ("[t]here is no real dispute that ... law enforcement functions typically have been undertaken by officials within the Executive Branch.").

To the extent that Defendants' actions and inactions were in violation of or designed to undermine the CLASI Order, the Defendants had no discretion, and, therefore, legislative immunity is not available. For example, the CLASI Order requires that a mental health evaluation be performed within 24 hours of placement of an inmate in restrictive housing (A177). The Complaint makes clear this was not done for Plaintiff or the class.

Citing longstanding Supreme Court and other state law precedent, the Supreme Court in <u>Bogan</u> explained that legislative immunity does not attach when the state actors "lacked discretion." <u>Bogan,</u> 523 U.S. at 51. The Court explained that a court order mandating that an official take a certain action creates a "ministerial duty," depriving that official of legislative immunity because, legally, they lacked discretion to do otherwise. <u>Id.</u> at 51-52 (quoting <u>Amy v. Supervisors,</u> 78 U.S. 136, 138 (1870)).  Accordingly, former Governor Markell is not clothed with legislative immunity.

## III.   PLAINTIFF SUFFICIENTLY ALLEGES PLAUSIBLE PERSONAL INVOLVEMENT BY THE DEFENDANTS.

In <u>Connelly v. Lane Constr. Corp.</u>, 809 F.3d 780, 786 (3d Cir. 2016), the Court held: "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." (quoting <u>Iqbal</u> 556 U.S. at 678) "The plausibility determination is a 'context-specific task that requires the reviewing court to draw on its judicial experience and common sense." (quoting <u>Iqbal</u> at 679)

13

The mission of the DOC is to "protect the public by supervising adult offenders through safe and humane services, programs, and facilities." (TAC ¶21 emphasis added) The named Defendants are the persons specifically tasked with providing safe and humane facilities for Plaintiff and the Class. The gist of the Complaint is that the Defendants failed to provide a safe and humane facility in Building C by their deliberate indifference to, inter alia, severe understaffing, ignoring specific safety warnings of staff, ignoring recommendations of experts and taskforces; and, perhaps, intentionally creating the volatile and deadly situation in Building C to undermine the CLASI Order. As a result of Defendants' actions and/or inactions, a small, but violent group of prisoners took control of the Building and took hostage and terrorized not just the correction officers, but Plaintiff and all of the other inmates.

To compound their actions, they gave orders to assault the inmates, deny them medical and psychiatric treatment, place them in solitary confinement, limit their food rations, and seize and destroy their personal property.

Without discovery, except as reflected in the public record, Plaintiff cannot know with certainty which Defendant gave which order. However, the Court drawing "on its judicial experience and common sense" (Connelly, supra. at 786) can reasonably infer that those responsible for operating JTVCC (the Defendants) were responsible for overseeing the safety, the treatment, housing, medical care, feeding, and personal property of Plaintiff and the other hostage inmates before and following their "rescue" on February 2, 2017. As discussed supra, Markell was responsible for ordering that crucial security staff not be hired.

The Complaint alleges that the takeover of Building C was a result of the reckless indifference of Pierce, Phelps, Coupe, and Markell to the safety of the corrections officers and the inmates. (TAC ¶2-3) These Defendants deliberately chose to understaff JTVCC. (Id. at ¶4)

They deliberately underpaid officers. (Id. at ¶5) They recklessly failed to train and monitor corrections officers. (Id. at ¶6) They permitted and encouraged officers to abuse prisoners (Id. at ¶7) The Complaint alleges that their reckless indifference to the safety and humane treatment at JTVCC was the cause of the attack and takeover of Building C. (Id. at ¶9) Parker was deputy warden on February 1 and 2, 2017 and was named acting warden on February 21, 2017. (TAC ¶15) Metzger was named warden on May 19, 2017. (TAC ¶16) Therefore, the Court can reasonably infer that Parker and Metzger were responsible for the retaliatory actions complained of from at least February 21, 2017 to the present. Plaintiff is classified as a medium security inmate, however, since February 2, 2017, he and other hostage inmates have been housed in maximum security buildings and in solitary confinement and deprived of basic necessities. (TAC ¶¶73, 76).

The Complaint alleges that Pierce, Parker, Phelps, and Coupe intentionally inflicted unreasonable, unnecessary, and unjustified physical and emotional pain and suffering on Plaintiff and the Class by: (a) ordering that all inmates rescued from C Building be beaten; (b) forming teams of corrections officers to attack and terrorize inmates; (c) failing to train staff to behave humanely towards prisoners; (d) failing to provide reasonable safety; (e) failing to remove or discipline known abusive officers; (f) ordering medical vendors to withhold medical, dental, and mental healthcare for C Building inmates; (g) ordering excessive restrictions to be placed on Plaintiff; (h) failing to alleviate overcrowding and understaffing; and (i) and undermining the CLASI Order. (TAC ¶124) Metzger, Phelps, and Parker continued to house Plaintiff in maximum security, restrict food, activities, and healthcare. (TAC ¶29) Pierce and the John Doe Defendants seized and destroyed Plaintiff's personal property. (TAC ¶132) Pierce Parker, and Metzger placed Plaintiff in maximum security housing despite his medium security classification

without any right to be heard. (TAC ¶133)  Markell, Pierce, Phelps, and Coupe knowingly created or worsened conditions at JTVCC that posed a substantial risk of serious harm to staff and inmates as well. (TAC ¶137)

## IV.   THE COMPLAINT STATES BOTH A PLAUSIBLE POLICY OR PRACTICE CLAIM AND A DIRECT LIABILITY CLAIM.

State actors may be held liable for their unconstitutional conduct in two general ways. First, liability may attach if they, "with deliberate indifference to the consequences, established and maintained a policy, practice, or custom which directly caused the unconstitutional harm…" "Second, a supervisor may be personally liable under §1983 if he or she participated in violating the plaintiffs' rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in the subordinates' unconstitutional conduct." Barkes v. First Corr. Med. Inc., 766 F.3d 307, 316 (3d Cir. 2014) Plaintiff has adequately and plausibly pled both types of unconstitutional conduct. The Complaint alleges that Pierce, Parker, and Phelps: ordered inmates rescued from C Building to be beaten; formed teams of John Doe Defendants to attack and terrorize inmates; ordered medical vendors to withhold medical, dental, and mental healthcare for Building C inmates; ordered medical staff to manufacture false records or injuries inflicted on February 2nd by John Doe Defendants and ordering excessive restrictions to be placed on Plaintiffs. (TAC ¶¶118, 124) Plaintiffs also alleged that Pierce, Parker, and Metzger violated Plaintiffs' rights by placing them in maximum security housing despite their medium security classifications, without any opportunity to be heard. (TAC ¶133)

Furthermore, Plaintiff alleges that Pierce, Phelps, and Markell failed to provide reasonable safety in C Building by refusing to provide an adequate amount of staff; refusing to install security cameras; refusing to implement recommendations in the 2005 report; not filling vacant security positions, and failing to properly train officers. (TAC ¶¶118, 124)

16

Importantly, the 2017 report shows that prison officials, presumably the warden, Pierce, and others, were warned by Lt. Floyd that certain inmates created a serious danger and should be removed from C Building. This direct and specific warning was ignored.

The treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment. Farmer v. Brennan, 511 U.S. 825, 832 (1994) The Eighth Amendment's prohibition of "cruel and unusual punishments" restrains prison officials from using excessive force against prisoners. Id. It requires that they provide humane conditions of confinement, including ensuring adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of inmates. Id. In particular, prison officials have a duty to protect prisoners from violence at the hands of other prisoners. Id. at 33.

To hold a prison official responsible, the deprivation must be objectively, sufficiently serious, and, in prison conditions cases, the officers state of mind must be one of "deliberate indifference" to inmate health and safety. Id. at 834. Under the "deliberate indifference" test, plaintiff need not show that a prison official acted or failed to act believing that harm would actually befall an inmate. It is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." Id. at 842. "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." Id. (Emphasis added.)

Each of the Plaintiffs' claims is both factually and legally plausible:

**A.      Use of Force**

Excessive use of force depends upon "whether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson v. McMillan, 503 U.S. 1, 6-7 (1992) The Complaint alleges that inmates were beaten while their

hands were tied behind their backs and they were face down and compliant. (TAC ¶55) <u>See</u> <u>also</u> (TAC ¶78) (A192-202)

### B.    Denial of Medical Care

Because inmates must rely on prison authorities to treat their medical needs, government has an "obligation to provide medical care for those whom it is punishing by incarceration." <u>Estelle v. Gamble</u>, 429 U.S. 97, 103 (1976) For about two months following February 2, 2017, medical staff were ordered by Pierce, Parker, and Phelps to withhold medical care for inmates from C Building. (TAC ¶¶65-69, 118, 124) Plaintiff has yet to receive treatment for a painful rib injury and PTSD.

### C.    Failure to Protect

"[P]rison officials have a duty…to protect prisoners from violence at the hands of other prisoners." <u>Farmer v. Brennan</u>, 511 U.S. 825, 833 (1994) As outlined above, the Complaint is replete with factual allegations that Defendants knew of the risks, yet failed to take known measures to provide for the safety of inmates at JTVCC. Furthermore, the public record reflects that just two weeks before the February 1, 2017 takeover, JTVCC supervisors and administrators were notified that certain inmates should be removed from C Building for security purposes, but the warnings were dismissed. Pierce issued a memo to staff which was viewed by former U.S. Attorney Oberly and former Judge Chapman as an attempt to cause the implementation of the CLASI Order to fail [by making JTVCC less safe]. Many, if not all, of the allegations in the Complaint, are supported by the public record for Rule 12(b)(6) purposes.

### D.    Due Process Claims

#### 1.    Seizure and Destruction of Property.

Prison officials may substantially restrict the property inmates may possess, "[B]ut when inmates are afforded the opportunity … to possess property, they enjoy a protected interest in

that property that cannot be infringed upon without due process." <u>Handberry v. Thompson</u>, 446 F3d 335, 353 n.6 (2d Cir. 2006) The Complaint alleges that Plaintiff's property was seized and destroyed.

### 2. Liberty Interest Claim

Under <u>Sandin v. Conner</u>, 515 U.S. 472 (1995), plaintiffs' due process rights are triggered by deprivation of a legally cognizable liberty interest. Such a deprivation occurs when the prison "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." In deciding whether a protected liberty interest exists, the court considers the duration of the disciplinary confinement and the conditions of that confinement in relation to other prison conditions. <u>Mitchell v. Horn</u>, 318 F.3d 523, 532 (3d Cir. 2003) This is a fact-specific inquiry. (<u>Id</u>.)

Plaintiff was classified as a medium security inmate. He was an innocent victim held hostage during the February 1 and 2 takeover. From February 2, 2017 to January 19, 2018, he was housed in SHU, deprived of medical, mental health, and dental care, and food rations, among other deprivations. However, was never charged with any infraction or offense, was never apprised of any reason for his restricted confinement, nor given any opportunity to be heard. The Complaint raises a plausible claim under <u>Sandin</u>.

## V. DEFENDANTS DO NOT HAVE QUALIFIED IMMUNITY

Qualified immunity protects officials from damage liability in Federal Civil Rights cases unless they violate clearly established statutory or constitutional rights of which a reasonable person would have known. <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 817-18 (1982) It focuses on the objective reasonableness of an official's conduct as measured by reference to clearly established law rather than their motives or state of mind. <u>Id</u>. at 818. Qualified immunity does not "protect state officials from civil liability" as Defendants state DOB at 17. It only applies to officials sued

in their individual capacities for money damages. It does not protect them if sued in their official capacity. <u>Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit</u>, 507 U.S. 163, 166-67 (1993)

Plaintiff's claims are asserted under the Eighth Amendment guarantee against cruel and unusual punishment and the Fifth and Fourteenth Amendment Guarantees of Due Process of Law. It is difficult to fathom an assertion by the persons appointed to administer and enforce the DOC policy of providing safe and humane services, programs, and facilities (TAC ¶21) that they did not know the constitutional rights alleged by Plaintiff were clearly established. Indeed, on April 2, 2015, Defendant Coupe issued DOC Policy Number 5.1 whose stated purpose is to "safeguard offender rights established in Federal and State Constitutions and Department Policies.." (A129) The Policy states, in part:

> "The Department recognizes that all offenders are entitled to certain basic rights afforded by the Constitution of the United States, as well as Federal and State statutes. Therefore, it is the policy of the Department of Correction to acknowledge and protect the basic rights of offenders in its custody."

This Policy obligated the Defendants to "identify all offender rights" and "develop procedures to ensure offender rights are safeguarded."

In light of <u>Farmer v. Brennan</u>, <u>supra</u>., and its progeny, and this Policy, it would have been unreasonable for Defendants not to have known that Plaintiff and the Class had a constitutional right to be free from excessive use of force, to have medical care, to be protected from violence at the hands of other prisoners, and to have protectable interests in personal property and liberty. As such, they are not entitled to qualified immunity.

## <u>CONCLUSION</u>

For each of the foregoing reasons, Defendants' Motion to Dismiss should be denied.

DATED: 2/6/17

SEITZ, VAN OGTROP & GREEN, P.A.

/s/ James S. Green, Sr.
JAMES S. GREEN, SR. (DE0481)
JARED T. GREEN (DE5179)
222 Delaware Avenue
Suite 1500
P. O. Box 68
Wilmington, DE 19899
(302) 888-0600
*Attorneys for Plaintiffs*