# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

DONALD D. PARKELL,          :
                                     :

           Plaintiff,          :
                                     :

           v.                 :      C.A. No. 17-157-LPS
                                     :

DAVID PIERCE, et al.,        :
                                     :

           Defendants.     :

---

James S. Green, Jared T. Green, SEITZ, VAN OGTROP & GREEN, P.A., Wilmington, DE

      Attorneys for Plaintiff

Joseph C. Handlon, Deputy Attorney General, Adria B. Martinelli, Deputy Attorney General, STATE OF DELAWARE DEPARTMENT OF JUSTICE, Wilmington, DE

      Attorneys for Defendant

---

## <u>MEMORANDUM OPINION</u>

June 22, 2018
Wilmington, Delaware



**STARK, U.S. District Judge:**

Plaintiff Donald Parkell ("Plaintiff" or "Parkell") filed this action under 42 U.S.C. § 1983, alleging violations of his and other inmates' rights under the Constitutions of the United States and Delaware.[1] (D.I. 1) Pending before the Court is Defendants David Pierce ("Pierce"), Phillip Parker ("Parker"), Dana Metzger ("Metzger"), Perry Phelps ("Phelps"), Jack Markell ("Markell"), Robert Coupe ("Coupe"), and John and Jane Does 1-100's (collectively, "Defendants") Motion to Dismiss filed pursuant to Federal Rules of Civil Procedure 8 and 12(b)(6). (D.I. 42) For the reasons discussed below, the Court will grant in part and deny in part Defendants' motion.

## I.    BACKGROUND[2]

### A.    Uprising at James T. Vaughn Correctional Center

On the morning of February 1, 2017, a group of masked armed inmates staged an uprising in Building C ("C-Building") of the James T. Vaughn Correctional Center ("JTVCC"). (*See* D.I. 41 ("TAC") ¶ 2) During the 18-hour siege, the "attacker" inmates killed Sergeant Steven Floyd and severely injured two other correctional officers, Winslow Smith and Joshua Wilkinson. (*See id.*) The attacker inmates also held a correctional counselor, Patricia May ("May"), who was inside C-Building at the time of the uprising – as well as the rest of the C-Building inmates, including Parkell – hostage. (*See id.*)

---

[1]No class has been certified. On March 26, 2018, the Court denied Parkell's motions for class certification (D.I. 8, 16) without prejudice in light of the appointment of counsel and the subsequent filing of Parkell's Third Amended Complaint. (*See* D.I. 48)

[2]This Background is based on the well-pleaded factual allegations in the TAC, which, at this stage, the Court is required to accept as true.

During the siege, Parkell and two other inmates "insinuate[d] themselves into the cell" in which May was being held captive and protected her for the duration of the takeover. (*See id.* ¶¶ 33-36, 40-43, 50-54)  While carrying May to the bathroom, Parkell suffered a separated rib. (*See id.* ¶ 40)  As the siege wore on, the hostage inmates packed up their belongings, securing them with electrical cords and placing them on top of their assigned bed racks, fearing the Delaware Department of Corrections ("DOC") might "destroy[] everyone's property." (*Id.* ¶ 45)  Inmates were later told the DOC planned to destroy their property. (*See id.* ¶ 61)

On the morning of February 2, 2017, police stormed C-Building and ended the standoff. (*See id.* ¶ 50)  As the joint task force retook C-Building and pulled May to safety, May called out to officers not to hurt Parkell and the two other inmates who had protected her. (*See id.* ¶¶ 51-52)  One officer, Sergeant Bane, assured Parkell and the others that they would not be hurt and told officers, "Don't hurt these three.  Make sure everyone knows not to hurt them." (*See id.* ¶¶ 53-54)  Other inmates, however, were "thrown to the pavement and pummeled," "beaten while their hands were zip-tied behind their backs . . . face down and peacefully compliant," and "kicked, stomped, and . . . knee[d]" by officers, despite never resisting. (*See id.* ¶ 55)  "Eyeglasses were punched off" inmates' faces and intentionally stomped on by officers. (*Id.*)  Officers stripped off inmates' clothing and then "sped [inmates] through a one minute [medical] triage," where – despite the beatings they had just endured – no injuries were reported. (*See id.* ¶ 56)

### B.    Alleged Reprisals

After the takeover, Parkell and the other C-Building inmates, who had been housed in a medium security building, were moved to maximum security housing. (*See id.* ¶ 57)  Once there,

Parkell and the others were denied clothes, shoes, linens, soap, toothpaste, and showers.  (*See id.*

¶ 58)  Inmates were placed in air-conditioned cells – without any sheets or blankets – despite the

fact that it was the middle of winter.  (*See id.* ¶ 58)  Parkell was confined to his cell except for

one hour every two days for a shower or recreation.  (*See id.* ¶ 59)  For a week after arriving in

secure housing, Parkell was denied Kosher meals and other inmates were denied meals that

accommodated their religious beliefs and allergies.  (*See id.* ¶¶ 60, 119)  For an extended time,

inmates' meals were reduced by half.  (*See id.* ¶ 64)  For approximately two months after the

takeover, Parkell and the other C-Building inmates were denied medical, mental health, and

dental care, despite great need for such care.  (*See id.* ¶¶ 65-68, 119)  Over time, these restrictions

were lightened, but Parkell's meals are still routinely tampered with; his PTSD and rib injuries,

incurred during the uprising, have gone untreated; and he remains in maximum security housing,

despite having a much lower security classification.  (*See id.* ¶¶ 69-78, 119)  Further, teams of

officers now roam JTVCC, "terroriz[ing] the incarcerated," including many C-Building inmates.

(*See id.* ¶ 78)

### C.    Parkell Files Suit

Two weeks after the uprising, Parkell sued Defendants under 42 U.S.C. § 1983, alleging

violations of his and the other hostage inmates' constitutional rights under the United States and

Delaware Constitutions.[3]  (*See* D.I. 1)  Since filing his original complaint, Parkell has been

appointed counsel and has subsequently filed a Third Amended Complaint ("TAC").  (*See* D.I.

30, 31, 48)  Parkell has also been transferred from JTVCC to SCI Camp Hill in Camp Hill,

---

[3]Under 42 U.S.C. § 1983, a plaintiff must allege that some person has deprived him of a
federal right and that the person who caused the deprivation acted under color of state law.  *See*
*West v. Atkins*, 487 U.S. 42, 48 (1988).

Pennsylvania.  (*See* C.A. 17-1496-LPS D.I. 23 at 1)

Parkell raises numerous claims, including excessive use of force and deliberate indifference (Count I); denials of medical, mental health, and dental treatment (Count I); unconstitutional conditions of confinement (Count I); due process violations related to seizure of his property and transfer to maximum security housing (Count II); failure to protect (Count III); failure to address known security risks (Count IV); and denials of medical and mental health care in violation of the Delaware Constitution (Count V).  (*See id.* ¶¶ 123-42)  Pierce, Parker, Metzger, Phelps, and John and Jane Does 1-100 are sued in their individual and official capacities.  (*See id.* ¶¶ 14-17, 20)  Markell and Coupe are sued in their individual capacities only. (*See id.* ¶¶ 18-19)  Parkell seeks injunctive relief and compensatory damages.  (*See id.* ¶¶ 129-30, 135-36)

On December 29, 2017, Defendants moved to dismiss the TAC under Rules 8 and 12(b)(6).  (*See* D.I. 42)  The motion is fully briefed.  (*See* D.I. 43, 45, 47)

## II.    LEGAL STANDARDS

Evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) requires the Court to accept as true all material allegations of the complaint.  *See Spruill v. Gillis*, 372 F.3d 218, 223 (3d Cir. 2004).  "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997) (internal quotation marks omitted). Thus, the Court may grant such a motion to dismiss only if, after "accepting all well-pleaded allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, plaintiff is not entitled to relief."  *Maio v. Aetna, Inc.*, 221 F.3d 472, 482 (3d Cir. 2000) (internal

quotation marks omitted).

However, "[t]o survive a motion to dismiss, a civil plaintiff must allege facts that 'raise a right to relief above the speculative level on the assumption that the allegations in the complaint are true (even if doubtful in fact).'" *Victaulic Co. v. Tieman*, 499 F.3d 227, 234 (3d Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). At bottom, "[t]he complaint must state enough facts to raise a reasonable expectation that discovery will reveal evidence of [each] necessary element" of a plaintiff's claim. *Wilkerson v. New Media Tech. Charter Sch. Inc.*, 522 F.3d 315, 321 (3d Cir. 2008) (internal quotation marks omitted).

The Court is not obligated to accept as true "bald assertions," *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (internal quotation marks omitted), "unsupported conclusions and unwarranted inferences," *Schuylkill Energy Res., Inc. v. Pennsylvania Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997), or allegations that are "self-evidently false," *Nami v. Fauver*, 82 F.3d 63, 69 (3d Cir. 1996).

## III. DISCUSSION

### A. Markell Is Protected by Legislative Immunity

Parkell alleges that Markell violated his Eighth Amendment rights by implementing a "vacant positions policy" that required 90% of positions at the DOC to go unfilled, thereby requiring an excessive amount of overtime to staff JTVCC and doubling the overtime budget in order to do so. (*See* TAC ¶¶ 100-02, 106-10) Markell, the former Governor of Delaware, is

generally alleged to have continued constitutionally deficient policies of his predecessor, former Governor Ruth Ann Minner. (*See* TAC ¶¶ 100-07) Markell, who is sued only in his individual capacity, contends he is entitled to legislative immunity for his involvement in appropriations decisions about the funding and staffing of JTVCC. (*See* TAC ¶ 18; D.I. 43 at 8-9)

"Absolute legislative immunity attaches to all actions taken 'in the sphere of legitimate legislative activity.'" *Baraka v. McGreevey*, 481 F.3d 187, 195-96 (3d Cir. 2007) (quoting *Bogan v. Scott–Harris*, 523 U.S. 44, 54 (1998)). The doctrine's protection extends not only to legislators, but to the actions of "public officials outside of the legislative branch when they perform legislative functions." *Id.* An executive function that is an "integral step[] in the legislative process" is typically considered a legislative act. *Bogan*, 523 U.S. at 55.

The Court agrees with Markell. "A legislator's exercise of discretionary and budgetary powers are entitled to legislative immunity." *Hogan v. Twp. of Haddon*, 278 F. App'x 98, 104 (3d Cir. 2008); *see also Bogan*, 523 U.S. at 55 ("Petitioner Bogan's introduction of a budget and signing into law an ordinance also were formally legislative, even though he was an executive official."). While Parkell argues that Markell's actions should be viewed as the "provision of security" – an executive function – Parkell does not allege that Markell himself was patrolling or otherwise providing security at JTVCC. *See* Opinion of the Justices, 380 A.2d 109, 112-13 (Del. 1977) (classifying security provided by "police force" that "pa[t]rol[s] the buildings and grounds of the Capitol" as "inherently executive"). Rather, Plaintiff's claims against Markell are based on decisions Markell made regarding the state budget, and, thereby, the composition of staffing at DOC. (*See* TAC ¶¶ 100-02, 106-10, 137) These actions – establishing an overtime budget and vacant position policy – required the exercise of discretion in how state funds would be

allocated and therefore are properly characterized as legislative in nature.  *See Hogan*, 278 F.

App'x at 104; *see also Youngblood v. DeWeese*, 352 F.3d 836, 842 (3d Cir. 2003) (reversing

denial of motion to dismiss based on finding that "acts of allocating . . . office-staffing

appropriation . . . are legislative acts to which legislative immunity extends"); *Guy v. Shabazz*,

2018 WL 792037, at *4 (D. Del. Feb. 8, 2018) (holding defendant was entitled to legislative

immunity where plaintiff's claim "implicate[d] the allocation of public resources" and "alleged

facts reflect[ed] a discretionary, policymaking decision [that] implicated budgetary concerns").

As such, Markell is entitled to legislative immunity.  *See Hogan*, 278 F. App'x at 104 (holding

that because mayor's decision, which would have required overtime payment, "involved

budgetary concerns, Mayor Park is also entitled to legislative immunity").

　　　　Nonetheless, Parkell contends Markell is not shielded by legislative immunity because he

lacked discretion in his decisionmaking under a court order resulting from a 2015 lawsuit filed by

Community Legal Aid Society, Inc. ("CLASI") ("CLASI Order"), making Markell's actions

ministerial rather than legislative.  (*See* D.I. 45 at 12-13)  This argument lacks merit.  The factual

allegations in the TAC never mention the requirements of the CLASI Order, either generally or

specifically as to Markell.  (*See* TAC ¶¶ 100-02, 106-10)  Nor does the TAC allege that Markell,

who was not a party to the CLASI Order, was responsible for carrying out the tasks Plaintiff

contends were required by it, such as performing mental health evaluations.  (*See id.*)  Indeed,

Parkell's allegations against Markell have nothing to do with the CLASI Order; this much is

evident by the fact Plaintiff does not raise his CLASI Order-predicated claim against Markell.

(*See* TAC ¶ 138)  Thus, the CLASI Order provides no basis to find Markell lacked discretion in

the budgetary and staffing decisions he made, and therefore does not deprive him of the

legislative immunity to which he is entitled.

Thus, the Court will dismiss Markell as a defendant.

## B.     Parkell's Federal Claims - Personal Involvement/Respondeat Superior

Parkell alleges a variety of violations of his rights under the Eighth, Fifth, and Fourteenth

Amendments against the remaining defendants.  (*See* TAC ¶¶ 123-38)  Parkell names as

Defendants multiple supervisory officials: Pierce, the former-warden of JTVCC (who was

serving as warden on February 1 and 2, 2017); Parker, the deputy-warden of JTVCC (who held

that position on February 1 and 2, 2017 and served as acting warden starting on February 21,

2017); Metzger, the warden of JTVCC (since May 19, 2017); Phelps, the DOC Commissioner;

and Coupe, the former-DOC Commissioner (who held that position from approximately 2013 to

2017).  (*See* TAC ¶¶ 14-20; D.I. 45 at 16)  He also seeks to press his federal claims against John

and Jane Doe Defendants, who are unknown DOC officers.  (*See* TAC ¶¶ 124, 126, 128, 132)[4]

---

[4]Defendants contend that "[n]aming John and Jane Doe defendants has no legal effect" because Delaware law does not permit fictitious name practice and, therefore, the claims against the John and Jane Doe Defendants must be dismissed.  (D.I. 43 at 3 n.1)  Defendants are correct that "Delaware law is clear that 'fictitious['] name practice is not permitted."  *Dayton v. Collison*, 2018 WL 565304, at *2 (Del. Super. Ct. Jan. 24, 2018); *see also id.* (dismissing state law claims against "Does 1 through 20" on that basis).  In federal court, however, "the practice of naming fictitious 'John Doe' defendants in an original Complaint operates to preserve the plaintiff's right to later name a defendant whose identity was not known at the time the Complaint was filed. Although the Federal Rules of Civil Procedure do not speak to this point directly, the practice is well-established."  *Farris v. Moeckel*, 664 F. Supp. 881, 894 (D. Del. 1987) (citing *Bivens v. Six Unknown Agents*, 403 U.S. 388 (1971); *see also Garvin v. City of Philadelphia*, 354 F.3d 215, 220 (3d Cir. 2003) (discussing when complaint relates back once party identifies John Doe)). While Parkell brings claims arising under both federal and state law, the Court need not decide whether federal or Delaware law governs the propriety of fictitious naming practice because Parkell raises his state constitution-based claims against only Pierce, Parker, and Metzger – not against John and Jane Doe Defendants.  *See generally Britt v. Arvanitis*, 590 F.2d 57, 60 (3d Cir. 1978) (holding that New Jersey rule about relation back of "John Doe" amended complaints was procedural rule and therefore not binding in diversity action).

Defendants contend the TAC fails to sufficiently allege personal involvement in the alleged violations.  (*See* D.I. 43 at 10)

"A defendant in a civil rights action must have personal involvement in the alleged wrongdoing; liability cannot be predicated solely on the operation of respondeat superior." *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005) (internal quotation marks omitted); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009) ("Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct.").  Facts showing personal involvement of the defendant must be asserted; such assertions may be made through allegations of specific facts showing that a defendant expressly directed the deprivation of a plaintiff's constitutional rights or created policies such that the subordinates had no discretion to act in a way that did not produce the alleged deprivation; e.g., supervisory liability may attach if the plaintiff asserts facts showing that the supervisor's actions were "the moving force" behind the harm suffered by the plaintiff.  *See Evancho*, 423 F.3d at 353; *Sample v. Diecks*, 885 F.2d 1099, 1117-18 (3d Cir. 1989); *see also Iqbal*, 556 U.S. at 677-86.  Such allegations must be plead with sufficient particularity; a complaint may be adequate when it states the conduct, time, place, and persons responsible for the alleged violations.  *Evancho*, 423 F.3d at 353.

### 1.    Parkell's Eighth Amendment Claims

#### a.    Use of Force

At the outset, the Court must address the issue of Parkell's standing to raise certain of his claims.  "The 'core component'" of the requirement that a litigant have standing to invoke the authority of a federal court "is an essential and unchanging part of the case-or-controversy

requirement of Article III." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 343 (2006) (citations omitted). "A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen v. Wright*, 468 U.S. 737, 751 (1984).

The TAC alleges that Pierce, Parker, Phelps, and Coupe ordered that the C-Building inmates be beaten as officers retook C-Building. (*See* D.I. ¶ 124(a)) Parkell, however, does not allege that he was beaten. Rather, Parkell concedes he was spared, allegedly because he protected May. (*See* TAC ¶ 119) ("Parkell was not beaten during the 'rescue' because of his protection of Ms. May . . . .") For that reason, Parkell lacks standing to challenge John and Jane Doe Defendants' use of force and the alleged role the named defendants played in directing that force. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992); *Powers v. Ohio*, 499 U.S. 400, 411 (1991). Parkell's allegations about Defendants ordering the falsification of inmates' medical records "to record no injured prisoners" after the siege are similarly deficient, as Parkell does not allege that he suffered injuries that were not recorded. (*See* TAC ¶ 56) Additionally, Parkell acknowledges that he was not subject to the conduct of the teams of John Doe Defendants, formed to roam and terrorize inmates. (TAC ¶ 119) (clarifying Parkell was not "subjected to the abusive shakedowns conducted by Defendants") Parkell therefore lacks standing to raise these claims. (*See* D.I. 47 at 5-6 & nn.14-15) Accordingly, his Eighth Amendment claims against Pierce, Parker, Phelps, and Coupe for ordering the use of excessive force and falsification of medical records, as well as his claims against John and Jane Doe Defendants based on their use of excessive force, will be dismissed.

Parkell, however, raises a number of additional claims under the Eighth Amendment for

which he does allege personal injury.

### b.     Medical Needs

The TAC alleges that for approximately two months after the February 1-2, 2017 uprising, Pierce, Parker, Phelps, and Coupe ordered medical staff to withhold medical, mental health, and dental care for C-Building inmates and that Metzger, Phelps, and Parker continue to withhold such care.  (*See* TAC ¶¶ 65-66, 129)

The Eighth Amendment proscription against cruel and unusual punishment requires that prison officials provide inmates with adequate medical care.  *See Estelle v. Gamble*, 429 U.S. 97, 103-05 (1976).  To set forth a cognizable claim of a violation of this right, an inmate must allege (1) a serious medical need and (2) acts or omissions by prison officials that indicate deliberate indifference to that need.  *See id.*; *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999).  A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and fails to take reasonable steps to avoid the harm.  *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  A prison official may manifest deliberate indifference by "intentionally denying or delaying access to medical care."  *Estelle*, 429 U.S. at 104-05.

Taking the TAC's allegations in the light most favorable to Parkell, the Court nonetheless agrees with Defendants that Parkell fails to sufficiently allege personal involvement by Pierce, Parker, Phelps, and Coupe as to his medical care.  First, the TAC's factual allegations do not mention Coupe.  As to the rest of the defendants, the TAC generally alleges that "Defendants" and "the DOC" ordered medical staff to withhold treatment and that certain unnamed individuals told inmates "the DOC would not permit" treatment for C-Building inmates.  (TAC ¶¶ 65-68) These allegations do not allow for the reasonable inference that Pierce, Parker, or Phelps

personally ordered the withholding of medical care, or that they were aware that the inmates needed medical care, yet were not receiving it. *See Restrepo v. Phelps*, 2018 WL 1664972, at *4 (D. Del. Apr. 6, 2018) (dismissing complaint alleging denial of mental health treatment at JTVCC after siege based on defendant's failure to "identify an individual who allegedly committed the wrongful act or who failed to take any action"). Moreover, while the TAC alleges that Metzger, Phelps, and Parker continue to restrict Plaintiff's access to medical and mental healthcare, again, there are no specific factual allegations in the TAC regarding any of those Defendants to support that assertion or to suggest that Defendants were aware of the denials of care yet did nothing to address them. *See Stones v. McDonald*, 7 F. Supp. 3d 422, 436 (D. Del.), *aff'd*, 573 F. App'x 236 (3d Cir. 2014) (requiring "allegations of ***specific facts*** showing that a defendant expressly directed the deprivation of a plaintiff's constitutional rights") (emphasis added). In this context, Parkell's contention that Pierce, Parker, Phelps, and Coupe ordered the withholding of care amounts to no more than a conclusory allegation and is insufficient to show personal involvement.

Accordingly, Parkell's Eighth Amendment claim against Pierce, Parker, Phelps, Coupe, and Metzger based on the withholding of medical care will be dismissed.

### c. Conditions of Confinement

Parkell raises numerous allegations relating to his conditions of confinement, including facing severe conditions immediately following the siege, food tampering, denial of religious meals, restrictions on commissary purchases, and strict limitations on the time he is allowed outside of his cell. (*See* TAC ¶¶ 63-64, 75, 119)

A condition of confinement violates the Eighth Amendment only if it is so reprehensible

as to be deemed inhumane under contemporary standards or it deprives an inmate of minimal

civilized measure of the necessities of life. *See Hudson v. McMillian*, 503 U.S. 1, 8 (1992);

*Wilson v. Seiter*, 501 U.S. 294, 298 (1991). In the context of a conditions of confinement claim,

the inmate must show: (1) the alleged deprivation is, objectively, sufficiently serious; and (2) the

prison official was deliberately indifferent to the inmate's health or safety. *See Farmer*, 511 U.S.

at 834. "Deliberate indifference" is a subjective standard, requiring the official to have known of

a "substantial risk of serious harm" and have disregarded the risk by "failing to take reasonable

measures to abate it." *Id.*

Parkell's allegations fail to sufficiently allege personal involvement by Pierce, Parker,

Phelps, Coupe, or Metzger. Parkell does not allege that any of the Defendants directed that the

C-Building inmates be housed in the conditions they faced following the siege or created a policy

that produced such an outcome. (*See, e.g.*, TAC ¶¶ 57-60, 63-68, 75 (alleging denials happened,

but not who ordered them (apart from "the DOC") or specific prison policy Defendants

employed); *see also Ward v. Taylor*, 2008 WL 2945955, at *7 (D. Del. July 29, 2008), *aff'd*, 348

F. App'x 766 (3d Cir. 2009) (granting summary judgement to defendants based on plaintiff's

failure to identify "specific policy or practice" defendants instituted or failed to employ that

caused alleged harm)) Similarly, the TAC does not allege who specifically reduced or tampered

with the meals and does not include any specific factual allegations to allow for the inference that

Pierce, Parker, Phelps, or Coupe did so. (*See* TAC ¶ 64) (alleging "meals were reduced to about

half of the normal diet") Additionally, the TAC does not allege that Pierce, Parker, Phelps, or

Coupe were aware that any of this was happening or implemented any policies under which

subordinates lacked discretion to do otherwise. All that is alleged or that can be reasonably

inferred is that Defendants must have had such knowledge due to their positions. This, however, is an improper basis on which to hold Defendants liable. *See Iqbal*, 556 U.S. at 676 ("[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.").

Accordingly, the Court will dismiss Parkell's Eighth Amendment conditions of confinement claim against Pierce, Parker, Phelps, Coupe, and Metzger.

### d. Failure to Train / Supervise

Parkell contends that Pierce, Parker, Phelps, and Coupe failed to train JTVCC staff to behave humanely towards inmates and failed to discipline or remove abusive officers. (*See* TAC ¶¶ 124(c), 124(e)) Establishing liability "on a failure to train claim under § 1983 is difficult." *Reitz v. Cty. of Bucks*, 125 F.3d 139, 145 (3d Cir. 1997). To do so, a plaintiff "must identify a failure to provide specific training that has a causal nexus with [his] injuries and must demonstrate that the absence of that specific training can reasonably be said to reflect a deliberate indifference to whether the alleged constitutional deprivations occurred." *Blacknall v. Citarella*, 168 F. App'x 489, 492 (3d Cir. 2006) (internal quotation marks omitted). The alleged "deficiency in the training program must be closely related to the ultimate injury," meaning "the deficiency in training [must have] actually caused" the constitutional violation. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989)).

Parkell's allegations fall short. To start, Parkell does not identify any particular policy or training that Pierce, Parker, Phelps, and Coupe should have provided that could have prevented Parkell from being taken hostage and subsequently injured. *See Reitz*, 125 F.3d at 145 (affirming grant of summary judgment where plaintiff failed to identify specific training that could have

prevented deprivation); *see also generally Canton*, 489 U.S. at 391 ("And, plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable.").  Additionally problematic for Parkell is that the TAC does not allege that any of the named Defendants were aware of the alleged abusive practices of the certain correctional officers and allowed them to continue.  Instead, Parkell generally alleges that "John Doe officers who are well known to use excessive force and to abuse the inmates receive very little or no discipline at all."  This general allegation, without more, is insufficient to allow for the reasonable inference that Pierce, Parker, Phelps, and/or Coupe knew officers were using excessive force against inmates, yet failed to do anything.

Accordingly, the Court will dismiss Parkell's failure to train claim against Pierce, Parker, Phelps, and Coupe.

### e.      Failure to Protect

The gravamen of Parkell's complaint is that various policies at JTVCC together created conditions at the prison, which created a substantial risk that an inmate might be seriously harmed.  Parkell contends that Defendants knew these conditions posed a substantial risk of harm, yet failed to protect him.  Parkell, as an inmate in C-Building during the siege, was taken hostage for 18 hours, suffered a separated rib while protecting May from the attacker inmates, and continues to suffer PTSD-like symptoms related to the takeover.

While the Eighth Amendment requires prison officials "to protect prisoners from violence at the hands of other prisoners," not every prisoner-inflicted injury amounts to a constitutional violation.  *Farmer*, 511 U.S. at 833-34.  To prevail on a failure-to-protect claim, a plaintiff must show (1) he is "incarcerated under conditions posing a substantial risk of serious harm,"

14

(2) prison officials acted with deliberate indifference to that risk, and (3) the official's deliberate indifference caused the inmate's harm. *Bistrian v. Levi*, 696 F.3d 352, 367 (3d Cir. 2012) (citing *Farmer*, 511 U.S. at 834).

Further, because Pierce, Phelps, and Coupe are sued based on their supervisory positions, in order to establish that they were deliberately indifferent, Parkell must (1) identify a specific policy or practice that they failed to employ and show that the existing policy or procedure created an unreasonable risk of a constitutional violation, and further allege that (2) the official was aware of but indifferent to the risk, and (3) the policy or procedure caused constitutional injury. *See Beers–Capitol*, 256 F.3d at 134. These elements are met where the supervisor "failed to respond appropriately in the face of an awareness of a pattern of such injuries" or where "the risk of constitutionally cognizable harm is so great and so obvious that the risk and the failure of supervisory officials to respond will alone support" a finding of deliberate indifference. *Sample*, 885 F.2d at 1118.

Parkell has alleged sufficient facts to state a claim against Pierce, Phelps, and Coupe. Parkell identifies numerous policies that he contends created an unreasonable risk of Eighth Amendment injury: (1) a failure to train correctional officers at JTVCC; (2) failure to discipline or investigate the use of force and encouragement of abuse of inmates; (3) chronic and severe under-staffing, including a "vacant positions" policy that required 90% of positions go unfilled; (4) excessive reliance on overtime to staff JTVCC; (5) underpayment of correctional officers; (6) failure to install security cameras; and (7) a refusal to implement recommendations in a 2005 task

force report or CLASI Order.[5]

Taking Parkell's factual allegations as true, they suggest that chronic understaffing, an over-reliance on overtime, failing to fill critical security positions within the prison, and the other policies Parkell challenges created,[6] in effect, a highly dangerous situation in which inmate violence was expected. (*See* TAC ¶¶ 79, 82, 103-10) This is sufficient, at this stage, to allow for the reasonable inference that Parkell was confined under conditions posing a substantial risk of harm.

As for deliberate indifference, Parkell alleges the "DOC Commissioners assisted [former-Governor] Minner" in camouflaging the severe levels of understaffing at JTVCC, including in "essential security positions." (TAC ¶¶ 86-87) Parkell alleges that in 2003 and 2004, the Corrections Association of Delaware ("COAD") warned that "severe levels of understaffing

_____

[5]Defendants contend that Count IV, based on the CLASI settlement, must be dismissed as the Complaint does not link the CLASI settlement to the events of February 1-2. (*See* D.I. 43 at 11 n.8) The Court agrees. The TAC does not contains any factual allegations relating to the CLASI agreement, including any allegations explaining how Defendants' alleged noncompliance caused the alleged constitutional violations. Therefore, the Court will dismiss this claim.

[6]Defendants contend it is improper for the Court to consider the 2005 task force report and CLASI Settlement in ruling on the motion to dismiss. (*See* D.I. 47 at 2 n.4) On a motion to dismiss, the Court may consider documents that are outside of the pleadings if they are "integral to or explicitly relied upon in the complaint." *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (internal quotation marks omitted). Here, the TAC refers to "[t]he report the task force created," but does not specify the name of the report, what task force drafted it, or any other way to identify it. (TAC ¶ 98) Count IV refers to "the agreement entered with CLASI," without any detail about the year of the agreement or the specific parties that joined it. (TAC ¶ 138) These passing references, without any specific citation to the particular report(s), are insufficient to make the documents "integral to" or "explicitly relied upon" in the TAC. *See Schmidt*, 770 F.3d at 249 (explaining notice concerns underlying general rule and exception). The Court, therefore, does not consider them on this motion to dismiss. Relatedly, the Court disagrees with Parkell that there is relevance, on a motion to dismiss, of contentions (not found in the TAC) to the effect that "[t]he public record corroborates many of the other allegations in the Complaint." (D.I. 45 at 6) The materials Parkell cites, such as the 2005 task force report, are not public records that the Court can take judicial notice of and are given no weight in this opinion.

would inevitably lead to murder, injury, or even rape" in Delaware prisons and publically revealed the levels of understaffing were reaching "crisis proportions." (*Id.* ¶¶ 93-95)  In July 2004, "a JTVCC counselor was abducted and held hostage by an inmate for hours while the inmate repeatedly and violently raped her." (*Id.* ¶ 96)  The TAC alleges that, despite the abduction, Governor Markell doubled the overtime budget and enacted a policy that relied on even more overtime to staff JTVCC – policies that the "DOC Commissioners, including Defendant Coupe," then implemented. (*Id.* ¶¶ 101-03)  Parkell specifically alleges "Coupe admitted while Commissioner that security [wa]s threatened markedly by understaffing." (*Id.* ¶ 105)

By 2016, Parkell further alleges the COAD President met with unspecified state officials multiple times "to warn of [the] possible death of DOC officers" if policies did not change and that multiple officers filed reports about "looming safety risks" at the prison. (*Id.* ¶¶ 9, 108-09)  Finally, in 2016, the COAD President warned that the situation in JTVCC was at "the same critical stage . . . as in 2004 [and] the wheels [we]re going to come off." (*Id.* ¶ 110) (internal quotation marks omitted)

Based on these allegations, Parkell has sufficiently alleged facts supporting an inference that Defendants were aware of the risk to inmates created by the challenged policies and were deliberately indifferent to that risk.  Parkell does not allege that his injuries were part of a pattern of similar injuries.  However, the severity of the 2004 abduction, coupled and the alarming and repeated warnings that prison officials were given about the risks associated with the staffing practices at JTVCC is enough, at this stage, to allow for the reasonable inference that a risk of injuries to inmates was "so great and so obvious" that deliberate indifference can be inferred

based on that risk and Pierce, Phelps, and Coupe's failure to respond to it. The Court cannot say, at this stage, that the siege – the source of Parkell's alleged injuries – was not a "highly predictable consequence" of the overtime, vacant positions, and pay policies implemented and carried out by Defendants. *Connick v. Thompson*, 563 U.S. 51, 64 (2011) (internal quotation marks omitted).

The same reasoning leads to the conclusion that Parkell has sufficiently alleged that the combination of these policies caused his injuries. There are sufficient factual allegations to allow for the reasonable inference that the siege would not have occurred in the absence of the challenged staffing and other personnel policies. (*See, e.g.*, TAC ¶ 82) Thus, the Court will deny Defendants' motion at to the failure to protect claim.

### 2. Parkell's Due Process Claims

### a. Deprivation of Personal Property

Parkell contends Pierce and John Doe Defendants violated his due process rights by "seizing, destroying, and/or refusing to return" his personal property as part of the aftermath of the prison siege. (TAC ¶ 132)

A due process claim based on the deprivation of personal property (whether negligent or intentional) is not actionable under § 1983 unless no adequate post-deprivation remedy is available. *See Parratt v. Taylor*, 451 U.S. 527, 542 (1981), *overruled on other grounds by* 474 U.S. 327 (1986); *Harris v. McMullen*, 609 Fed. App'x 704, 705 (3d Cir. 2015) (unpublished). Delaware provides an adequate remedy: a common law claim for conversion of property. Hence, Parkell cannot maintain a due process cause of action pursuant to § 1983 and the claim is subject to summary dismissal. *See Harris*, 609 Fed. App'x at 705; *Drumgo v. Pierce*, 2018 WL

1762217, at *5 (D. Del. Apr. 12, 2018) (dismissing inmate's due process claim arising out of allegation that his personal property was taken and destroyed during JTVCC siege).

Moreover, while the TAC alleges that "[a]ll inmates were repeatedly told that the DOC [was] going to destroy everyone's property," the TAC also states inmates were informed "the DOC should return [their property] eventually." (TAC ¶¶ 61-62) Additionally, the TAC lacks sufficient factual allegations to show Pierce either directed these seizures or was aware of them and did nothing to respond to it.

Accordingly, the Court will dismiss Parkell's due process claim against Pierce and the John and Jane Doe Defendants based on his alleged deprivations of property.

### b. Housing/Classification

Parkell contends that Pierce, Parker, and Metzger violated and continue to violate his due process rights by transferring and continuing to confine him in maximum security housing. (*See* TAC ¶¶ 133-35)

To succeed on his claims, Parkell must demonstrate that he was deprived of a liberty interest. *See Fraise v. Terhune*, 283 F.3d 506, 522 (3d Cir. 2002). The Due Process Clause does not subject an inmate's treatment by prison authorities to judicial oversight as long as the degree of confinement or conditions to which the inmate is subjected are within the sentence imposed and do not otherwise violate the Constitution. *See id.* Maximum security or housing in SHU is within the sentence imposed on Parkell; his transfer to a less amenable and more restrictive custody does not implicate a liberty interest arising under the Due Process Clause. *See Torres v. Fauver*, 292 F.3d 141, 150 (3d Cir. 2002). Nor does Delaware state law create such liberty interests. *See Carrigan v. Delaware*, 957 F. Supp. 1376, 1385 (D. Del. 1997) ("Repeatedly, this

19

[c]ourt has determined that the State of Delaware has created no constitutionally protected interest in a prisoner's classification."); 11 Del. C. § 6529(e) (giving DOC power to maintain "any" system of classification at its institutions). Thus, Parkell lacks "a liberty interest in being housed in a particular institution or at a particular custody level." *Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 225 (3d Cir. 2015). Accordingly, his due process claim against Pierce, Parker, and Metzger based on his placement in maximum security housing will be dismissed.

### D.     Qualified Immunity

Parkell alleges that Defendants violated his "constitutional right to be free from excessive use of force, to have medical care, to be protected from violence at the hands of other prisoners, and to have protectable interests in personal property and liberty." (D.I. 45 at 20) Defendants contend that they cannot be held liable in their individual capacities under the doctrine of qualified immunity because Plaintiff has not alleged Defendants violated any clearly established right. (*See* D.I. 43 at 18) In Defendants' view, Parkell has alleged nothing more than that Defendants were involved in the state budgeting process. (*See id.*)

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citation omitted). The two-step test as set forth in *Saucier v. Katz*, 533 U.S. 194 (2001), is not mandatory, but often is appropriate when analyzing qualified immunity. *See Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009). Under the *Saucier* protocol, the Court first examines whether or not the alleged conduct, taken in the light most favorable to Parkell, violated a constitutional right. *See Saucier*, 533 U.S. at 201. "If no constitutional right

would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Id.* If the allegations amount to the violation of a constitutional right, the Court proceeds to the second inquiry and determines if the right was "clearly established in the specific context of the case." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004); *Saucier*, 533 U.S. at 202 (noting that officer is entitled to qualified immunity unless "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted"). Courts have the discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand. *See Pearson*, 129 S. Ct. at 818.

As discussed above, Plaintiff's due process claims do not amount to a violation of his constitutional rights, ending the Court's inquiry as to those claims. Putting aside that Parkell lacks standing to assert some of the other claims, the parties' contentions raise factual questions that make it difficult (if even possible) to resolve the immunity question at this stage. *See Banner v. Fletcher*, 2018 WL 1377099, at *4 (D. Del. Mar. 19, 2018) ("Still, 'it is generally unwise to venture into a qualified immunity analysis at the pleading stage as it is necessary to develop the factual record in the vast majority of cases.'") (quoting *Newland v. Reehorst*, 328 F. App'x 788, 791 n.3 (3d Cir. May 12, 2009)). Therefore, even assuming (without deciding) that the rights at issue are "clearly-established," the Court will deny the motion to dismiss based on qualified immunity without prejudice to renew on a fuller record.

### E.    Delaware Constitution Claim

Finally, Defendants argue that Count V of the TAC, which alleges that Pierce, Parker, and Metzger violated Parkell's rights under Article 1, Section 11 of the Delaware Constitution, is

subject to dismissal.  (*See* D.I. 43 at 7 n.6; *see also* TAC ¶¶ 140-41)

Defendants are correct that § 1983 does not provide a cause of action for violations of state law.  *See Brown v. Grabowski*, 922 F.2d 1097, 1113 (3d Cir. 1990).  However, the Court may exercise supplemental jurisdiction over state law claims where the state and federal law claims derive from a common nucleus of operative facts, such that they would ordinarily be expected to be adjudicated in one proceeding.  *See City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 164-65 (1997); *see also* 28 U.S.C. § 1367 ("[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.").  Here, Parkell's Delaware constitutional claim is premised on the same operative facts as one of his federal claims, namely the alleged denials of medical and mental healthcare.  (*See* TAC ¶¶ 139-41)  Accordingly, the Court may exercise jurisdiction over Parkell's state law claims.  *See City of Chicago*, 522 U.S. at 166; *Guy v. Shabazz*, 2018 WL 792037, at *3 (D. Del. Feb. 8, 2018).

However, like § 1983 claims, alleged violations of a plaintiff's rights under the Delaware Constitution cannot be based on respondeat superior.  *See Frink v. MacLeish*, 2009 WL 29444, at *3 (D. Del. Jan. 5, 2009).  As discussed above, Parkell has failed to sufficiently plead personal involvement of Defendants regarding the alleged denials of medical and mental healthcare, and, therefore, he has failed to plead sufficient factual allegations to withstand dismissal under the Delaware Constitution.  *See Mullin v. Sussex Cty.*, 861 F. Supp. 2d 411, 424 (D. Del. 2012).  Accordingly, Count V will be dismissed.

## IV.     LEAVE TO AMEND

Plaintiff requests that, if the Court is inclined to dismiss any of his claims, he be permitted to file yet another amended complaint.  (*See* D.I. 45 at 11-12)  Such would be Plaintiff's fifth complaint.  (*See* D.I. 1, 5, 35, 41; *see also* D.I. 9, 19 (supplementing First Amended Complaint))  The Court is required to grant leave to amend liberally and should ordinarily deny such a request only when amendment would be futile or it is sought for an improper purpose, such as delay.  *See Foman v. Davis*, 371 U.S. 178, 182 (1962).

Here, despite the numerous prior occasions on which Plaintiff has already amended his complaint, and despite the fact that some of the flaws the Court has identified in this Opinion cannot be corrected, the Court will grant Plaintiff one final chance to amend.  The allegations here are, obviously, quite serious.  Additionally, two of Plaintiff's prior complaints were filed before he had counsel.  The Court does not find that Plaintiff's request to amend yet again is the product of any improper motive.

Accordingly, Plaintiff will be given thirty (30) days to file a final amended complaint. Should he not do so, the case will go forward only on those claims, and only against those Defendants, that have survived the Court's ruling on the pending motion to dismiss.

## V.     CONCLUSION

An appropriate Order follows.